IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | |
| v. | |
| GLOUCESTER ENVIRONMENTAL MANAGEMENT SERVICES, INC, | CIVIL NO. 84-0152 (JBS) |
| Defendants. | [CONSOLIDATED] |
| | CIVIL NO. 92-3860 (JBS) |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **OPINION** |
| v. | |
| AIR PRODUCTS AND CHEMICALS INCORPORATED, et al., | |
| Defendants. | |

APPEARANCES:

Gary J. Lesneski, Esquire
Archer & Greiner, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ  08033
     Attorney for the GEMS Phase II Trust

Mark Oshinskie, Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, NJ  08625-0093
     Attorney for the New Jersey Department of Environmental
     Protection

Patricia C. Hick, Esquire
Office of Regional Counsel
United States EPA - Region II
290 Broadway, 17th Floor
New York, NY  10007
     and
Brian G. Donohue, Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environ. Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, DC  20044
     Attorneys for the United States Environmental Protection
     Agency

Lawrence E. Rosoff, Solicitor
Camden County Municipal Utilities Authority
1645 Ferry Avenue
Camden, NJ  08104
     Attorney for Camden County Municipal Utilities Authority

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

     This case involves the sixty-acre Gloucester Environmental

Management Services, Inc. ("GEMS") Landfill, a federal Superfund

hazardous waste site, located in Gloucester Township, Camden

County, New Jersey, which remains under this Court's supervision

as a thirty-year remedial program is underway.  After extensive

negotiations regarding the remediation of the Landfill, pursuant

to the Comprehensive Environmental Response, Compensation, and

Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9601, et seq.,

and other federal and state environmental laws, the parties to

this action entered into a Consent Decree on June 27, 1997, which

the Court approved pursuant to CERCLA.  The Consent Decree

required, inter alia, that the GEMS Phase II Trust (the "Trust,"
which is composed of representatives from various potentially
responsible party group constituencies) undertake "the
construction of a Groundwater Extraction System ("GWE") and an
On-Site Groundwater Pre-Treatment ("OSPT") System . . . , and the
operation of the GWE and OSPT systems with discharge of the
treated water to the Gloucester Township Municipal Utilities
Authority ("GTMUA") sewerage system for final treatment at the
[Camden County Municipal Utilities Authority]." State of N.J.,
Dept. of Environmental Protection v. Gloucester Environmental
Management Services, Inc., No. 84-0152, 2005 WL 1129763, at *1
(D.N.J. May 11, 2005).  This extraction, pre-treatment, and
treatment process commenced in July 2005, after the Court
directed the CCMUA to issue a permit authorizing discharge of the
pre-treated effluent, subject to "reasonable conditions for
operations and monitoring." Id. at *25.

    The landfill's pretreatment system has discharged effluent
that has been rigorously tested for more than three years without
a single parameter even approaching a permitted limit.  Presently
before the Court is the Trust's "motion to enforce litigant's
rights" [Docket Item 2470], in which the Trust argues that the
CCMUA's refusal to relax certain monitoring requirements set
forth in its permit after three years violates the Court's
direction that the monitoring requirements be reasonable.  For

3

the reasons set forth below, the Court will grant in part and deny in part the Trust's motion.

## II.   BACKGROUND

### A.   Enforcement of the Consent Decree

The extensive history of this decades-old case has been described in numerous prior opinions by this Court, see, e.g., GEMS, 2005 WL 1129763, at *1-*8; Dept. of Environmental Protection v. Gloucester Environmental Management Services, Inc., 264 F. Supp. 2d 165, 168-174 (D.N.J. 2003), and is reviewed herein only to the extent necessary to resolve the motion presently under consideration.  Under the terms of the Consent Decree entered into by all parties to this litigation in 1997, groundwater was to be extracted from the GEMS Landfill and pre-treated at the OSPT, after which the OSPT-treated effluent would be discharged to the GTMUA sewer system for final treatment at the CCMUA.  See GEMS, 2005 WL 1129763, at *1.  Under the Decree, the extraction, pre-treatment, and discharge program, which was expected to take thirty years to complete, was to be operated by the Trust for the first ten years before being turned over to the NJDEP for continued operation.  (Consent Decree ¶ 45.)

Ten years ago, the potential for radionuclides at the Landfill was a matter of particular concern.  Prior to the start-up phase of this treatment program,

> the CCMUA requested that samples of effluent from the
> Landfill be analyzed for radionuclides.  In late 1999 to

4

2000, a series of tests indicated low levels of radionuclides in the wells of the Landfill, raising concerns with federal, state and local agencies. The analysis indicated the low level presence of gross alpha and gross beta particle activity . . . .

The detection of the low-level radionuclides prompted careful study, reconsideration and actual testing . . . . In fall 2002, the CCMUA adopted the . . . stringent national drinking water standards (MCLs) as the standard it would apply to radionuclides associated with any discharge from the GEMS Landfill. The CCMUA notified the NJDEP and the EPA of its position that it would not accept the groundwater unless "all radionuclides are removed on-site to meet drinking water standards, and all other pollutants are removed on-site to meet normal industrial sewerage standards." The CCMUA therefore required that the pre-treated GEMS Landfill wastewater must meet the standards for drinking water (as far as radionuclides are concerned) before discharge to the CCMUA could be permitted . . . .

The Trust's engineering evaluation of December 20, 2002 confirmed that the effluent from the OSPT System met drinking water standards for radionuclides . . . . The final data generated in December 2002 further confirmed that radionuclides pose no risk to human health.

Id. at *2-*4 (footnotes omitted).

In April of 2003, owing to the CCMUA's withdrawal of its permit when the radionuclides issue arose, the Trust filed a motion with this Court to enforce the Consent Decree. The Court issued an Opinion and Order on May 29, 2003, which upheld the Consent Decree and directed the CCMUA, with the cooperation of the New Jersey Department of Environmental Protection ("NJDEP"), "to draft an appropriate proposed permit for the CCMUA's receipt of the pretreated effluent . . . , subject to the procedures for

public notice and comment." See GEMS, 264 F. Supp. 2d at 173, 180.

After the CCMUA issued its draft permit, the NJDEP filed a motion to amend the Consent Decree, in which it argued that the discovery of even low-level radionuclides required the EPA to pursue alternative remedial measures at the Landfill, and the EPA filed a cross-motion to enforce the Decree. In its May 11, 2005 Opinion and Order, the Court denied the NJDEP's motion and granted the EPA's motion. See GEMS, 2005 WL 1129763, at *25. With regard to the NJDEP's concerns over the risk posed by the presence of radionuclides, the Court explained, in light of the CCMUA's adoption of EPA drinking water standards for pre-treated effluent, that the EPA's standards

> reflect stringent safety concerns and employ the best available science by EPA for water that is intended to be consumed by the public. In this case, as demonstrated throughout the pilot study, the pretreated effluent from the GEMS Site will meet national drinking water standards for radionuclides. The water from GEMS would be pretreated and discharged to the CCMUA's regional sewage treatment system and is not meant to be ingested by the public and thus poses an even lesser threat to the public health than the small risk allowed by EPA for water that is intended to be consumed over a lifetime. Therefore, in insisting upon compliance with the national safe drinking water standards for radionuclides, the CCMUA would put into place the highest degree of protection for public health and safety . . . .

> There is simply no basis for concluding that the pretreated effluent of the GEMS Site in general, or the radionuclide component in particular, will pose any measurable risk to the residents of Gloucester Township or of Camden where the regional treatment plant is located. The parties have continuously agreed that the

6

radionuclides including uranium will be carefully
monitored much like any other contaminant of waste, to
assure that the GTMUA and CCMUA systems and the
environment are not harmed in any way. These agreed upon
procedures lead to the inescapable conclusion that the
NJDEP has no reasonable basis for refusing to comply with
its obligations under the Consent Decree.

Id. at *18, *22. The Court then "direct[ed] the CCMUA to issue
the final permit forthwith, including reasonable conditions for
operations and monitoring." Id. at *25.

### B.    The CCMUA Permit and Monitoring Parameters

In accordance with this order, the CCMUA issued the final
permit on June 6, 2005, and extraction and pre-treatment of the
Landfill groundwater commenced shortly thereafter. (Lee Cert.
Ex. A.) The permit contains monitoring requirements for two
broad categories of parameters: radionuclide parameters and non-
radionuclide parameters. (Id. at 5, 7.) With regard to the
first category, the permit requires weekly monitoring of five
radionuclide parameters – gross alpha, gross beta, radium-226,
radium-228, and total uranium – and sets forth maximum
concentrations for each.[1] (Id. at 7.)

As to non-radionuclide parameters, the permit requires
thrice weekly testing of a large number of organic and inorganic
compounds and tentatively identified compounds ("TICS"), as well

---

[1] Specifically, the permit sets the maximum concentration
of the respective radionuclide parameters as follows: gross alpha
(15 pCi/L); gross beta (50 pCi/L); radium-226 and -228 (5 pCi/L);
and total uranium (30 ug/L). (Lee Cert. Ex. A at 7.)

7

as weekly monitoring of certain additional pollutants.  (Id. at

5, 6, 8.)  With regard to those non-radionuclide parameters

tested three times per week, the permit provides:

> When three (3) months of sampling analysis, based on a
> frequency of three (3) times per week as listed in the
> Effluent Limitations and Monitoring Requirements Table
> fall below the maximum concentrations stated in the Final
> Industrial Discharge Permit, the permittee may apply for
> a reduced sampling schedule for those parameters listed
> as three (3) times per week, from three (3) times per
> week to weekly.  The Authority will promptly respond in
> writing with the approval or denial of the request.

(Id. at 10.)  Thus, the permit itself anticipated that the CCMUA

would take the actual experience of sampling non-radionuclide

parameters into account in considering any request by the Trust

to reduce the frequency of testing.

## C. Ongoing Monitoring and the Trust's Efforts to Modify Testing Requirements

During the three-plus years these parameters have been in

place, the monitoring has not, to date, revealed a single

instance of excessive concentrations of the substances in

question in the effluent that has been discharged to CCMUA.[2]  As

the data began to indicate concentrations of substances well

below the limitations provided by the permit, the Trust has

endeavored to persuade CCMUA to modify the monitoring

requirements.  On March 24, 2006, William J. Lee, Project

---

[2]  The parties agree that there have been monitoring events
suggesting higher concentrations, but that this anomalous data
has been attributed to false positives and laboratory error.

Coordinator for the GEMS Landfill remediation project,[3] submitted to Andrew Kricun, the Deputy Executive Director and Chief Engineer of the CCMUA, a lengthy proposal requesting that numerous modifications to both the radionuclide and non-radionuclide monitoring requirements be made.  (Lee Cert. Ex. C.) In particular, the Trust proposed that the means by which the gross alpha parameter is tested be altered to a "co-precipitation method"; that the Trust be permitted to take radionuclide samples on the same day from week to week; that the separate tests for uranium and radium be dispensed with unless the gross alpha results yield concentrations above the EPA drinking water standards; that gross beta parameters be tested once per month rather than once per week; that the turnaround time for all data reporting be extended to four weeks; and that measures for TICs and other compounds be tested on a weekly, rather than thrice-weekly, basis.  (Id. at 19-21.)

Mr. Kricun responded to the Trust in a letter dated May 11, 2006.  (Lee Cert. Ex. D.)  Citing the fact that "we have only nine months of data, when the remediation effort is expected to last 30 years," the CCMUA declined the Trust's request to discontinue uranium and radium monitoring and to reduce the frequency of gross beta and non-radionuclide testing.  (Id. at 2-

---

[3]  Mr. Lee works for De Maximis, Inc., the company employed by the Trust to oversee the GEMS remediation project.

3.)  The CCMUA agreed that radionuclide sampling could take place on the same day each week, granted the Trust's request to modify the testing method for the gross alpha parameter, and agreed to reconsider the due dates for laboratory reporting "provided that the Trust can provide supporting documentation from its laboratories that would demonstrate the unavoidable necessity of allowing such a modification."  (Id.)  It is not apparent from the record whether or not the Trust submitted the supporting documentation requested by CCMUA.

On June 20, 2007, the Trust submitted a letter to CCMUA in which it renewed its request for permit modification.  (Lee Cert. Ex. E.)  In its letter, the Trust requested that the permit be amended in order to allow the Trust to utilize "the gross alpha parameter as a trigger for radium and uranium measurements," with these latter measurements being taken only if gross alpha levels reach a concentration suggesting that the measurements are called for.  (Id. at 1.)  In support of this request, the Trust emphasized that since extraction and pre-treatment at the Landfill commenced, no radium measurement had exceeded the 5 piC/l limit contained in the permit, and no uranium measurement had exceeded the permit's 30 ug/L limit.  (Id.)  In addition, the Trust requested that the permit be modified to reduce the frequency of testing for non-radionuclide parameters, noting that "the maximum concentration for any of these parameters is two

orders of magnitude or more from the Discharge Limit, or zero in many cases." (<u>Id.</u> at 2.)  In a July 18, 2007 letter on behalf of the CCMUA, Mr. Kricun stated, without explanation, that "the CCMUA has determined that it will not entertain any modifications to the Trust's discharge permit at this time." (Lee Cert. Ex. F.)

In a February 26, 2008 letter to CCMUA, the Trust reiterated its request that the permit be modified in light of the evidence of continuous non-hazardous concentrations of radioactive and non-radioactive substances as reflected in the testing data. (Lee Cert. Ex. G.)  The Trust requested that it be permitted to conduct the gross beta test and the test for non-radionuclide compounds on a monthly, rather than weekly, basis; that the testing for TICs no longer be required; and that the gross alpha testing serve as a screen for the uranium parameter. (<u>Id.</u> at 1-2.)  Mr. Kricun responded on behalf of the CCMUA in a March 18, 2008 letter, stating only that the "request was discussed at the CCMUA's March 17, 2008 Board meeting and it was decided that we cannot grant this request at this time." (Lee Cert. Ex. H.)

### D.    The Reasonableness of the Testing Parameters

The Trust and the CCMUA continue to dispute the reasonableness of the sustained application of the same monitoring parameters that were put in place when the permit was first issued.  As Mr. Lee attests in his Certification,

> [a]fter nearly three years of operation of the [OSPT]
> system, and over four hundred (400) monitoring events,
> with literally thousands of data points, not a single
> exceedence has been reported on any non-radionuclide
> parameter.  In fact, most of the parameters have been at
> non-detect levels, and none have ever been detected at
> even one-tenth of the discharge limit in this untreated
> influent, let alone in the treated discharge.

(Lee Cert. ¶ 7) (emphasis omitted).  With regard to radionuclide

testing, Mr. Lee's Certification indicates that "[i]n nearly

three years of sampling at GEMS no beta particle activity at any

level has been found in the ground water . . . which was not

explained by the presence of harmless potassium."  (Id. at ¶ 8)

(emphasis omitted).

According to the Trust, the monitoring requirements imposed

by the CCMUA permit are far more rigorous than those that have

been required at other landfills and Superfund sites.  As Mr. Lee

explains in his Certification:

> The Final Permit monitoring requirements are orders of
> magnitude beyond what is required at other remediation
> sites.   A review of more than one hundred (100)
> remediation sites, both within and outside New Jersey,
> with which [De Maximis, Inc.] is involved, confirms that
> monitoring   requirements   are   typically   monthly   or
> quarterly.  Among the reviewed sites, twenty-one (21) are
> groundwater remediation locations, fourteen (14) of which
> are landfill/buried drum sites, and nine (9) of which are
> located in New Jersey, including the nearby Kramer
> Landfill, which discharges into the Gloucester County
> MUA.  The majority of these sites do monthly monitoring
> and four (4) do quarterly monitoring.   Only GEMS is
> required to monitor more frequently than monthly.
> Indeed,  the  thrice  weekly  monitoring  requirements
> mandates monitoring thirteen (13) times more frequently
> than these other known sites.

(Id. at ¶ 4) (emphasis omitted).

12

The CCMUA responds to Mr. Lee's discussion through the Affidavit of Mr. Kricun.  According to Mr. Kricun, frequent monitoring parameters are called for in this case "because of the nature of the source – a Superfund landfill site."  (Kricun Aff. ¶ 4.)  Mr. Kricun explains the significance of this point:

> Specifically, unlike a normal discharger in which today's discharge will predictably be the same as yesterday's or tomorrow's, a landfill's discharge can vary from day to day.  Even after three years of impeccable data, or longer, a buried tank could finally rust through and discharge a new type of liquid that has not reached the groundwater before.  That is why it is important to take reasonably frequent "snapshots in time" in order to properly monitor the condition of the groundwater.  If too much time elapses between monitoring events, then a change in the discharge characteristics could have occurred during the intervening period resulting in the potential for adverse impact to the public health and/or environment.

(Id.)  In light of the "heterogeneous nature" of the GEMS Landfill,[4] (id. at ¶ 5), the CCMUA opposes the Trust's request

---

[4]  In his Supplemental Certification, Mr. Lee disputes Mr. Kricun's characterization of the GEMS Landfill as being heterogeneous.  According to Mr. Lee, the groundwater data from the site dating back to 1992 does not demonstrate the irregular "spikes" that would characterize the test results of such a heterogenous environment.  (Lee Supp. Cert. ¶ 2.)  Mr. Kricun, in a Supplemental Affidavit, contests this reasoning, noting that "if it were certain that yesterday's data reliably predict's tomorrow's, as suggested by the GEMS Landfill Trust, then there would be no point in continuing any monitoring at all, since all would be known for the 27-year balance of the remediation process," (Kricun Supp. Aff. ¶ 1); Mr. Kricun repeats his example of "an illegally deposited drum of waste . . . finally rust[ing] through" in order to demonstrate the need for sustained, frequent monitoring.  (Id. at ¶ 2.)

13

that the parameters for radionuclide or TICS be tested less frequently than the permit presently provides.  (Id. at ¶¶ 6, 8.)

However, in view of the fact that in the years since the issuance of the permit there have been no exceedances that are not attributable to human and laboratory error, Mr. Kricun concedes that a reduction in the frequency of non-radionuclide monitoring from thrice weekly to once per week is appropriate in this case.  (Id. at ¶ 5.)  Mr. Kricun likewise concedes that it is redundant to require the Trust to monitor both uranium and gross alpha levels, and agrees that uranium should be monitored only if the gross alpha parameter exceeds the EPA drinking water standards of 15 pCi/L.  (Id. at ¶ 7.)

### E.    Beta Exceedance in June 2008

On October 14, 2008, after briefing on the motion under consideration was complete, the Court entered an Order [Docket Item 2477] permitting the CCMUA to reopen the record in order to submit evidence of recent events that CCMUA argues are relevant to the disposition of the Trust's motion.  On June 26, 2008, De Maximis received the results on the gross beta sample taken on June 2, 2008, but due to "human error," De Maximis did not review the results until July 21 or 22, 2008.  (Cornforth Aff. ¶¶ 10-11.)  The June 26 beta sample yielded an "extraordinarily high reading of 196.59 pCi/L, almost four times the permit limit of 50 pCi/L."  (Id. at ¶ 11.)  De Maximis did not shut down the

14

groundwater flow upon reviewing the lab results, and did not notify CCMUA of the results until July 23, 2008, both of which actions were inconsistent with the requirements outlined in the permit.  (Id.)

According to the CCMUA, because of the availability of weekly beta monitoring, it was able to verify that the reading for the beta sample of June 2, 2008 was erroneous.  The results of beta sampling from June 9, 2008 and June 16, 2008 were consistent with the figures that had been reported before June 2, which enabled the CCMUA to conclude that the report from the June 2, 2008 sample was the product of laboratory error.  (Id. at ¶ 12.)  As Robert Cornforth, Director of the Operations and Maintenance Department at the CCMUA, explains,

> because there is weekly monitoring, . . . the CCMUA did not have to order GEMS to shut down the groundwater flow, did not have to notify the Gloucester Township Municipal Utilities Authority and its employees that there was potential exposure to an exceedance of radioactive material, did not have to notify our CCMUA employees, our sludge haulers, and their recipient sludge landfill sites of the same, and did not have to notify the NJDEP.  If the GEMS-requested reduced monitoring were in effect, the foregoing would have occurred, and disseminated into the public domain immediately.  Our sludge haulers would have stopped sludge removal; 160 tons of sludge per day would be piling up.

(Id.)  Thus, it remains true that the gross beta parameter, in three-plus years of weekly testing, remains essentially at zero, and the Trust seeks to reduce the frequency to monthly testing.

## III. DISCUSSION

In its motion, the Trust argues that the CCMUA's unwillingness to modify the monitoring requirements in the permit after three years of data demonstrating values for the monitored parameters at levels below the permit limitations fails to comply with the Court's requirement that the conditions required by the permit be "reasonable." GEMS, 2005 WL 1129763, at *25.  The Court reviews its jurisdiction over this dispute before turning to the merits of the Trust's motion below.

### A.    The Court's Jurisdiction

As the Court explained in its May 2005 Opinion, the "Consent Decree entered into by the parties expressly provides for this Court's continuing jurisdiction over the parties and the subject matter of that decree." Id. at *20 (citing Consent Decree ¶ 62).[5]  The Court went on to explain that "it is a well-established principle that a court has jurisdiction to

--------------------------------------------------

[5]  The Consent Decree provides:

This Court retains jurisdiction over both the subject matter of this Consent Decree and the Plaintiffs and the Settling Defendants for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XX (Dispute Resolution) hereof.

(Consent Decree ¶ 62.)

enforce the terms of its own consent decree, as a judicial

decree." Id. (citing S.E.C. v. Hatch, 128 F.R.D. 58, 60 (D.N.J.

1989)).  As the Supreme Court has explained:

> A Consent Decree no doubt embodies an agreement of the
> parties and thus in some respects is contractual in
> nature.  But it is an agreement that the parties desire
> and expect will be reflected in, and be enforceable as,
> a judicial decree that is subject to the rules generally
> applicable to other judgments and decrees.

Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 378

(1992); National R.R. Passenger Corp. v. Pennsylvania Public

Utility Comm'n, 342 F.3d 242, 259 (3d Cir. 2003) (recognizing

that "a federal district court has authority to enforce its

consent decrees").

In this case, the Court "retains jurisdiction over the

Consent Decree and [] has the authority to enforce its terms as

necessary." GEMS, 2005 WL 1129763, at *20.  The Court exercised

such authority in its May 2005 Opinion and Order when it ordered

"the CCMUA to issue the final permit forthwith, including

reasonable conditions for operations and monitoring." Id. at

*25.  In light of both its retained jurisdiction over the Consent

Decree and its "retain[ed] jurisdiction to enforce its prior

orders," New Jersey Sports Productions, Inc. v. Don King

Productions, Inc., 15 F. Supp. 2d 546, 550 (D.N.J. 1998)

(citation omitted), the Court has jurisdiction to enforce its

mandate that the conditions for operations and monitoring in the

CCMUA's permit be "reasonable." GEMS, 2005 WL 1129763, at *25;

17

see also, e.g., RoadTechs, Inc. v. MJ Highway Tech., Ltd., 83 F. Supp. 2d 677, 685 (E.D. Va. 2000) (noting that "[i]t has long been recognized that federal courts have inherent jurisdiction to protect and enforce their orders and judgments") (citation omitted).

The Court thus disagrees with the CCMUA's suggestion that the Trust is time-barred from seeking to modify the requirements in the permit because it did not file a request for an adjudicatory hearing pursuant to N.J.S.A. 7:14A-17.2 within the thirty-day period provided in section 7:14A-17.2(b). Irrespective of whether the Trust would have had a separate remedy to challenge the permit through the mechanisms provided by New Jersey law, this Court retains jurisdiction to enforce the Consent Decree, see National R.R. Passenger Corp., 342 F.3d at 259, and has the "inherent jurisdiction to protect and enforce [its] orders" entered thereunder, including its order requiring that the CCMUA's permit conditions be reasonable.  RoadTechs, 83 F. Supp. 2d at 685.

**B.   Standard of Review**

In reviewing the CCMUA's compliance with the Court's order that the monitoring requirements be reasonable, the Court borrows, by analogy, the standard under which New Jersey courts review the actions of administrative agencies.  Under New Jersey law, "[c]ourts generally defer to an agency's expertise on

technical matters within the agency's field of expertise," In re
Stream Encroachment Permit, 402 N.J. Super. 587, 597 (App. Div.
2008), and the Court does not "substitute its judgment of the
facts for that of an administrative agency." Campbell v. New
Jersey Racing Com'n, 169 N.J. 579, 587 (2001).  Accordingly,
under New Jersey law, courts "will reverse the decision of an
administrative agency only if it is arbitrary, capricious, or
unreasonable, or if it is not supported by substantial credible
evidence in the record as a whole." P.F. on Behalf of B.F. v.
New Jersey Div. of Developmental Disabilities, 139 N.J. 522, 529-
30 (1995) (citations omitted); see also Dennery v. Board of Educ.
of Passaic County Regional High School District #1, 131 N.J. 626,
641 (1993).  Agency action is arbitrary and capricious if it has
"no rational basis" or if the action is "willful and unreasoning
. . . without consideration and in disregard of circumstances."
In re Proposed Xanadu Redevelopment Project, 402 N.J. Super. 607,
642 (App. Div. 2008) (citations omitted).

**C.  Reasonableness of Permit Testing Requirements**

The Court reviews the reasonableness of the permit's testing
requirements for radionuclide and non-radionuclide parameters in
turn below.  As the Court explains in detail, infra, with regard
to radionuclide testing, the Court cannot find that the CCMUA's
requirement that the Trust test radionuclide levels on a weekly
basis is unreasonable in light of the importance of monitoring

such conditions and the demonstrated benefit that weekly testing has provided; to the extent that the Trust seeks an order from the Court directing the CCMUA to modify its requirement that radionuclide testing occur on a weekly basis, therefore, the Trust's motion will be denied.  As to the monitoring of non-radionuclide parameters, including the test for TICS, the Court finds that continuing to require weekly or thrice weekly testing is no longer reasonable, and will accordingly direct the CCMUA to modify its permit to require testing of non-radionuclide parameters every two weeks.

      1.   Radionuclide Parameters

The Court first addresses the Trust's argument that it is unreasonable for the CCMUA to continue to require it to test gross beta radionuclide parameters[6] on a weekly basis.  At the outset, the Court emphasizes the obvious but important point that "careful and appropriate monitoring" of radionuclide levels has been central to the its prior decisions addressing the CCMUA

---

[6] All parties agree that it is redundant, and would thus be unreasonable, to require the Trust to monitor both uranium and gross alpha levels.  (Kricun Aff. ¶ 7.)  As the CCMUA concedes, it is sufficient for the Trust to monitor gross alpha levels on a weekly basis and test for uranium only if the gross alpha level exceeds the EPA drinking water standards of 15 pCi/L.  (Id.)  The Court will therefore direct the CCMUA to amend its permit accordingly.

Additionally, as Mr. Lee certifies, the Trust "has not sought a monitoring reduction for gross alpha."  (Second Supp. Lee Cert. ¶ 10.)  The following discussion thus does not consider the reasonableness of the CCMUA's requirement that the Trust continue to monitor gross alpha levels on a weekly basis.

permit and the discharged effluent from the GEMS site.  GEMS, 264
F. Supp. 2d at 176; see also GEMS, 2005 WL 1129763, at *22.  That
is, while the Court has been clear that in this case, there is
nothing to suggest that the "pretreated waste stream[,] which has
been shown to lie within the limits set in the national safe
drinking water standards, will pose a meaningful risk of harm to
human health or the environment when discharged to the regional
sewage treatment system," it has likewise emphasized that "strict
monitoring and performance requirements" for radionuclides are
indispensable to such a conclusion.  GEMS, 2005 WL 1129763, at
*22.  In light of the consistent recognition by the Court and the
parties of the importance of such strict monitoring of
radionuclide levels in this case, the Trust's burden in
establishing that the sustained application of the testing
requirements for radionuclides in the CCMUA permit is no longer
reasonable is not insubstantial.

The Court finds that the Trust has not sustained this
burden.  While radionuclide testing of the landfill effluent to
date has yielded no exceedances that are not attributable to
laboratory error, (Lee Cert. ¶ 8; Cornforth Aff. ¶ 12), the Court
cannot conclude that the CCMUA's determination that weekly
testing for radionuclides is called for in light of the
"heterogeneous nature of landfills," (Kricun Aff. ¶ 5), is
unreasonable.  The Court agrees with the CCMUA that the mere fact

21

that there have not been irregularities in radionuclide levels in testing to date does not so obviate concerns over the contents of the landfill's discharge in the future as to render the CCMUA's interest in weekly radionuclide testing unreasonable.

The CCMUA's position concerning importance and utility of weekly testing for radionuclides finds support in the events surrounding the exceedance in beta levels reported in June 2008. As the Court explained, supra, on June 26, 2008, De Maximis received the facially alarming results on the gross beta sample tested on June 2, 2008, but as a result of "human error," it did not review the results until July 21 or 22, 2008.  (Cornforth Aff. ¶¶ 10-11.)  Because of the requirement in the permit that radionuclide parameters be tested on a weekly basis, the CCMUA could rely upon samples taken after June 2 to conclude that the report on the June 2 sample was the product of laboratory error, (id. at ¶ 12); without weekly reports, the CCMUA would not have had the data from which to draw such a conclusion, which would have resulted in the host of precautionary measures, including the potential dissemination to the public of a false alarm over radioactive substances, detailed in Mr. Cornforth's Affidavit. (Id.)  The Court does not find the CCMUA's interest in weekly testing in order to reduce the need for the CCMUA to undertake such measures while new tests are taken to be unreasonable given

the importance of "careful and appropriate monitoring" of radionuclide levels.  GEMS, 264 F. Supp. 2d at 176.

It bears noting that a "mandatory five[-]year permit renewal process" will commence when the permit at issue here is up for renewal in June 2010, which will afford the parties the opportunity to revisit the question of whether it is reasonable to continue to require the Trust to test the radionuclide parameters on a weekly basis.  (Kricun Aff. ¶ 10.)  While the Court has determined that it is not unreasonable at this time for the CCMUA to require the Trust to continue to test for radionuclide parameters on a weekly basis, this determination comes at a point when only ten percent of the thirty-year remediation process has been completed.  Should the data continue to demonstrate no radionuclide exceedances in the effluent at the five-year mark, when one-sixth of the remediation process has been completed, the CCMUA should reevaluate whether it is reasonable to continue to require the weekly sampling schedule for radionuclide testing.

At this time, however, the Court cannot conclude that it is unreasonable for the CCMUA to require the Trust to test radionuclide parameters on a weekly basis.  To the extent that the Trust's motion seeks an order from this Court directing the

CCMUA to modify the gross beta sampling schedule required by its permit, this aspect of the motion will be denied.[7]

2.   Non-Radionuclide Parameters

The Trust and the CCMUA likewise dispute whether it is reasonable for the CCMUA to continue to require the Trust to monitor non-radionuclide parameters at the frequencies provided in the permit.  As the Court explained, supra, the CCMUA permit originally called for thrice weekly testing of the majority of non-radionuclide parameters, and provided that after three months, the Trust could "apply for a reduced sampling schedule" of such parameters.  (Lee Cert. Ex. A at 10.)  The CCMUA declined the Trust's repeated requests that it reconsider the frequency of non-radionuclide testing, although Mr. Kricun now concedes that weekly testing would not be inappropriate in light of the consistency of permit-compliant concentrations revealed in the sampling data to date.  (Kricun Aff. ¶ 5.)

For the reasons now discussed, the Court finds that although the caution evidenced in the sampling schedule for non-radionuclide parameters was justified when the permit first issued, the data compiled over the three years of operations

_____

[7]   As the Court explained in Note 6, supra, the CCMUA concedes that it is not necessary for the Trust to monitor both gross alpha and uranium levels.  The Court will accordingly direct the CCMUA to eliminate the uranium testing requirement from its permit and to require uranium testing only if the gross alpha level exceeds the EPA drinking water standards of 15 pCi/L.

requires that the frequency of non-radionuclide testing now be
revisited.  Initially, the Court notes that the prudence
exhibited in the CCMUA's thrice weekly testing schedule was not
unjustified at the time the permit was first issued in light of
the stakes involved, the proximity of the treatment and discharge
sites to the local population, and the limited data then
available concerning the contents of the discharge.  The parties
appear to have acknowledged that the thrice weekly testing
schedule embodied a cautious, early-stage approach, in that the
permit itself provides for the reevaluation of the schedule once
increased data became available.  (Lee Cert. Ex. A at 10.)  Such
a prudent approach was not, in the early years of operation,
unreasonable.

At this time, however, with the benefit of "over four
hundred [] monitoring events . . . [demonstrating] not a single
exceedence . . . on any non-radionuclide parameter," (Lee Cert. ¶
7) (emphasis omitted), the Court agrees with the Trust that it is
no longer reasonable for the CCMUA to refuse to modify the
testing frequency requirements for non-radionuclide parameters.
Under the permit's own terms, the CCMUA promised to review the
sampling schedule after three months and to modify the sampling
frequency of the majority of non-radionuclide parameters if the
data indicated that such modifications were called for.  (Lee
Cert. Ex. A at 10.)  In the years since the permit was issued,

the Trust sought relief under this provision of the permit on three occasions, (Lee Cert. Exs. C, E, G), which the CCMUA denied.  Only in its denial of the Trust's first request did the CCMUA articulate a rationale for its decision, noting that "we have only nine months of data." (Lee Cert. Ex. D at 2.)  With more than three years of permit-compliant data now available, the CCMUA has failed to come forward with anything to indicate that the continued testing of non-radionuclide parameters at the thrice-weekly frequency required by the permit is reasonable, when the permit itself makes the sampling schedule for the majority of non-radionuclide tests subject to reevaluation.  In the absence of such evidence or explanation, the Court cannot conclude that the CCMUA's determination has a "rational basis," Xanadu Redevelopment Project, 402 N.J. Super. at 642, or is "supported by substantial credible evidence in the record as a whole." P.F., 139 N.J. at 529-30.  In light of this extensive data demonstrating that none of the non-radionuclide parameters have ever approached the threshold of concern at the GEMS site, the Court finds that the permit's testing schedule for non-radionuclide parameters is no longer reasonable.

In apparent recognition of this, the CCMUA, through Mr. Kricun's Affidavit, concedes that weekly testing of these parameters would not be inappropriate.  (Kricun Aff. ¶ 5.)  As Mr. Lee's survey of the monitoring requirements at other

remediation sites demonstrates, however, weekly monitoring of non-radionuclide parameters would still require the Trust to take samples at a much higher frequency than has been required at any landfill or groundwater remediation project in the record before the Court; testing at such sites is generally conducted on a monthly or quarterly basis.  (Lee Cert. ¶ 4.)  After three years of tests, during which "not a single exceedence has been reported on any non-radionuclide parameter," (id. at ¶ 7), the Court cannot conclude that requiring the Trust to test at at least four times the frequency of the monitoring rate at comparable sites would be reasonable, considering the costs that such a rate of testing would impose.  (Id. at ¶ 22.)

The Court finds, in light of the undisputed and extensive evidence of permit-compliant concentrations of non-radionuclide substances in the data compiled to date, (id. at ¶ 7), and in view of the testing rates employed at comparable groundwater remediation sites, (id. at ¶ 4), that testing of non-radionuclide parameters on a biweekly basis would, at this time, satisfy the Court's requirement that the CCMUA's permit impose "reasonable conditions for operations and monitoring."  GEMS, 2005 WL 1129763, at *25.  Compared with the monthly or quarterly testing of these parameters at comparable remediation sites, even this new requirement of biweekly testing, would be two to six times

more intensive, thus continuing to supply an extra margin of safety in a continuous and reliable monitoring program.

The Court declines, however, to grant the Trust's request for monthly monitoring.  While it is true that similar sites require monthly or quarterly monitoring for pretreated discharges to municipal and regional treatment plants, this Court defers to the CCMUA's observation that it is still relatively early in the thirty-year treatment period so that extra testing remains necessary to develop a history and retain confidence in the data base.  If, as the Trust predicts, the detected values of contaminants in the discharged effluent remain completely satisfactory in the coming months and years, the CCMUA will be in a position to reexamine the need for biweekly monitoring.

The Court will accordingly direct the CCMUA to issue a modified permit that requires the Trust to sample non-radionuclide parameters at a rate no greater than once every two weeks.

## IV.  CONCLUSION

For the reasons discussed above, the Court will grant in part the Trust's motion.  The CCMUA is directed to issue a modified permit that requires the Trust to monitor gross alpha levels on a weekly basis and test for uranium only if the gross alpha level exceeds the EPA drinking water standards of 15 pCi/L, and that requires testing of non-radionuclide parameters at a

frequency no greater than once every two weeks.  To the extent that the Trust's motion seeks an Order requiring the CCMUA to adjust the radionuclide testing requirements in the permit, this aspect of the motion will be denied.  The accompanying Order will be entered.


**December 17, 2008**                          **s/ Jerome B. Simandle**
Date                                           JEROME B. SIMANDLE
                                               United States District Judge